**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ | ) |
| **WAGNER AND WAGNER AUTO SALES,** | ) |
| **INC.,** | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | ) |
| | ) |
| **LAND ROVER NORTH AMERICA, INC.,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**Civil Action No.**
**06-40109-FDS**

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a dispute between an automobile dealer and distributor concerning the termination

of a dealer agreement.  Plaintiff Wagner and Wagner Auto Sales, Inc. ("Wagner") alleges that

defendant Land Rover North America, Inc., ("LRNA") wrongfully terminated a 2004 Temporary

Dealer Agreement between the parties.  Specifically, Wagner alleges that LRNA violated Mass.

Gen. Laws. ch. 93B and the Automobile Dealer's Day in Court Act, 15 U.S.C. § 1222.

LRNA has moved for summary judgment, contending that the undisputed facts entitle it to

judgment as a matter of law.  For the reasons set forth below, summary judgment will be granted.

**I.      Statement of Facts**

The facts are set forth in the light most favorable to the plaintiff except where noted.

**A.      The 1999 Letter of Intent**

Wagner is a Massachusetts automobile dealer.  At all relevant times, Wagner had franchise

agreements to sell Mercedes-Benz, BMW, Audi, and Jaguar automobiles.  Wagner's principal

dealership, where Mercedes-Benz, Audi, and Jaguar vehicles are sold, is located at 67 Main Street in Boylston, Massachusetts.  Wagner maintains separate BMW dealerships in West Springfield and Shrewsbury, Massachusetts.

LRNA is the exclusive United States distributor of Land Rover vehicles, parts and accessories.  LRNA sells Land Rover products to franchised motor vehicle dealers for resale to the public.

In September 1999, LRNA and Wagner entered into a letter of intent to establish a "Land Rover Centre."  Under the 1999 letter of intent, Wagner was to open a new permanent facility for the sale of Land Rover vehicles and products at a specific site in Boylston, Massachusetts.  The facility was required to conform to specific LRNA construction guidelines and was to be completed and open to the public by July 31, 2000.  (Def. Ex. 4, ¶ 3).

Wagner contends that it spent approximately $250,000 to prepare for this new facility, including architect's drawings, staff training, advertising, and equipment.  In the interim, Ford Motor Company acquired LRNA.  In 2000, after the change in ownership, Ron Wagner, the CEO and 95% owner of Wagner, was told by Ford to cease work on the facility pending Ford's finalization of the marketing plan for Land Rover.  (R. Wagner Dep. at 87).  Wagner complied with this request, and the "Land Rover Centre" was never constructed.[1]

**B.      The 2002 Letter of Intent**

In 2001, LRNA began to give dealers and potential dealers the option of establishing combined Land Rover/Jaguar dealerships, as Land Rover's new parent company, Ford, now held

---

[1]  LRNA contends that the actual reason for Wagner's non-performance was that Wagner could not obtain a necessary zoning change until mid-2001.

the rights to both brands.  (Delaney Dep. at 16, 33-35).  On October 21, 2002, LRNA and

Wagner entered into a new letter of intent that annulled and replaced the 1999 agreement.

According to this letter of intent, Wagner was to construct a combined Land Rover/Jaguar

dealership at the corner of Main Street and Brookside Avenue in Boylston.  (Def. Ex. 6).  This

facility was to be fully operational and open for business by March 31, 2004.

### C.   The 2004 Letter of Intent

By October 2003, Wagner and LRNA began to discuss moving the proposed Land

Rover/Jaguar facility to a location on Route 9 in Shrewsbury.  (Pl. Ex. 1).  LRNA regarded the

Shrewsbury site as the "superior site."  (*Id.*).  Specifically, LRNA employees believed that the

Shrewsbury site

> has high visibility, high traffic count, proximity to other brands . . . and many other
> franchises are close by.  This location alone would increase retail sales by 20%.
> From an investment point of view, it would be more prudent to build on Rte. 9
> than in a residential area on Main St. in Boylston, MA.

(*Id.*).  On November 6, 2003, Ron Wagner wrote to LRNA asking to change the location of the

proposed Land Rover/Jaguar facility from Boylston to property that Wagner owned on Route 9 in

Shrewsbury.  (Def. Ex. 7).  Wagner and LRNA eventually entered into a "Letter of Intent

Amendment - Land Rover Shrewsbury." on June 24, 2004.  (Def. Ex. 8).

The 2004 letter of intent stated that it replaced all previous agreements between the

parties, and annulled Wagner's deadlines under the 2002 letter of intent.  Under the new

agreement, Wagner was to build a new facility conforming to LRNA's guidelines in Shrewsbury.

This facility was to be complete and in full operation by February 28, 2006.  (*Id.* at ¶ 6).  The

new agreement also set forth the following interim construction deadlines:

August 31, 2004 – furnish LRNA with acceptable preliminary building and site

drawings;

October 31, 2004 – apply for all necessary local zoning, planning board and other

regulatory approvals;

March 31, 2005 – furnish final detailed drawings; identify a general contractor and

provide a detailed construction schedule; obtain all permits, and begin

construction; and

September 30, 2005 – complete site work and all exterior building production.

(*Id.*).  The 2004 letter of intent further specified that the "planning volume" of the new facility

was to be a combined 400 vehicles:  250 Land Rovers and 150 Jaguars.  (Def. Ex. A1).  The

central building itself was to be 22,532 square feet.  (*Id.*).

Unlike the 1999 and 2002 letters of intent, the 2004 letter of intent allowed Wagner to

operate as "Land Rover Boylston" on a temporary basis at a "Temporary Facility" at 67 Main

Street in Boylston.  (*Id.* at ¶ 3).  If Wagner met the first interim deadline on August 31, 2004,

Wagner was to be granted a "Temporary Land Rover Dealer Agreement" ("TDA").  (*Id.*).

Significantly, if Wagner was granted the TDA, any failure by it "to meet any of the foregoing

deadlines" (including the final operational deadline) or to "otherwise fail to satisfy [its]

commitments" under the 2004 letter of intent "shall also constitute a substantial and material

breach of the [TDA] . . . warranting the termination of [the TDA]."  (*Id.* at ¶ 4).  The 2004 letter

of intent also expressly provided that "time is of the essence with respect to [the letter's]

schedule."  (*Id.* at ¶ 6).  Finally, the 2004 letter of intent declared that only written modifications

to its terms would be valid, and stated (in general terms) that LRNA did not waive Wagner's

4

obligations by allowing it to continue to operate as a franchise after a material breach.  (*Id.* at ¶¶ 8, 12).

Wagner contends that at the time of the execution of the 2004 letter of intent, it was unaware that Jaguar was reducing its manufacturing capacity.

**D.      August 2004 Temporary Dealer Agreement**

Wagner met the August 31, 2004 interim deadline to provide preliminary building and site drawings to LRNA, and was therefore granted a TDA on that date.  *(See* Def. Ex. 9).  The TDA expressly incorporated the terms of the 2004 letter of intent.  (*Id.* at ¶ A).  Under the TDA, Wagner's temporary license to sell Land Rovers would expire (1) when Wagner opened the permanent Shrewsbury facility for business, (2) if Wagner committed a material breach of the 2004 letter of intent, or (3) on February 28, 2006 (the final deadline for completion of the Shrewsbury facility).  (*Id.* at ¶ C).

The temporary Land Rover franchise was opened at Wagner's pre-existing dealership in Boylston in September 2004.  At some unspecified point after opening the temporary facility, CEO Ron Wagner concluded that the proposed permanent Land Rover/Jaguar facility would not be financially viable under the planning volume and size specifications of the 2004 letter of intent. According to Wagner, that conclusion was based in part on LRNA's May 2005 decision to pull a specific model of Range Rover, the Freelander, from the U.S. market.  (Pl. Ex. 2).  Wagner contends that it had been selling Freelanders in the September 2004-May 2005 period and considered them to be "an important part of their product mix."  (M. Wagner Aff. ¶ 26).

In addition, Jaguar sales in the United States after 2002 had been in a state of steady decline.  Jaguar new vehicle sales in the U.S. totaled 61,205 in 2002; 54,655 in 2003; 45,876 in

2004; 30,424 in 2005; and 20,683 in 2006.  (Pl. Ex. 4).[2]

E.    **The Parties' Communications after August 2004**

It is undisputed that Wagner did not meet the October 31, 2004 interim deadline for applying for all necessary local zoning, planning board, and other regulatory approvals.  Ron Wagner contends that it did not do so because LRNA had not timely approved the preliminary building and site drawings.  (R. Wagner Dep. at 206-08).  It is also undisputed that Wagner did not meet the March 31, 2005 deadline for furnishing detailed construction drawings to LRNA or hiring a general contractor for the project.  (*Id.* at 212, 214).

On May 16, 2005, LRNA's vice president, Tassos Panas, contacted Wagner to inquire as to why the March 31 deadline had not been met.  (Def. Ex. 10).  The letter explicitly stated, "We would like to take this opportunity to reiterate that the '*time is of the essence*' paragraph in your letter of intent is material and will be enforced."  (*Id.* at ¶ 1) (emphasis in original).  Wagner responded on July 13 stating that it needed more time to adjust its business model due to declining Jaguar sales and the withdrawal of the Freelander model from the U.S. market.  (Def. Ex. 11).  Wagner asked for an indefinite extension of time to perform its obligations.  (*Id.*).

On August 18, LRNA responded that it was "willing to agree" to a twelve-month extension of the 2004 letter of intent deadlines "*subject to your signing amended agreements.*" (Def. Ex. 12, ¶ 2) (emphasis added).  The new proposed deadlines would be (1) a January 31, 2006 deadline to submit construction drawings, (2) a March 31, 2006 deadline to begin construction, (3) a September 30, 2006 deadline to complete all site work and the building shell

---

[2]  It is unclear if Wagner is alleging that it did not know of Jaguar's declining fortunes before signing the 2004 letter of intent or entering into the August 31, 2004 TDA.  As a Jaguar dealer since 1995, it is difficult to imagine that Wagner was not aware of the drop-off in Jaguar sales after 2002.

and (4) a final completion date of February 28, 2007.  (*Id.*).  LRNA also expressed its willingness to discuss reducing the size of the facility to a "planning volume" of 350 vehicles.  (*Id.* at ¶ 3).

On August 29, Wagner responded with a request for an extension of "up to three years." (Def. Ex. 13, ¶ 7).  Wagner contended that it had been ready for "final design" of a Land Rover dealership in 2000, and it was the Ford takeover and Ford's subsequent request to delay the project that had led to the "current problems."  Mr. Wagner again referred to the fact that "the bottom has fallen out of Jaguar sales" and expressed concern that rising gas prices would also affect sales.  (*Id.* at ¶¶ 3-6).

On September 19, LRNA responded by repeating its offer of a one-year extension and expressing a willingness to "take another look at the size of the Shrewsbury facility . . . ."  (Def. Ex. 14, ¶ 3).  When Wagner failed to respond to that offer, George Delaney—an LRNA employee whose job responsibilities included assisting Land Rover/Jaguar retailers building new facilities—e-mailed the company on October 18.  (Def. Ex. 15).  The e-mail included a "reduced size facility capacity summary" that suggested a building of 20,333 square feet and a combined 300-vehicle "planning volume" (200 Land Rover, 100 Jaguar).  Delaney stated that this would be "a starting point for reducing the facility size."  (*Id.* at ¶ 1).

Wagner failed to respond in writing.  Wagner contends, however, that from January through March 2006, both Ron and Mark Wagner had a series of conversations with Virginia Slocum, who had replaced Delaney as LRNA's liaison with the dealership.  (R. Wagner Dep. at 261-62).  Ron Wagner repeatedly told Slocum that he was willing to construct a facility on Route 9 as long as it was downsized.  (*Id.* at 262).  Wagner contends that on the basis of the letters and conversations "in the fall of 2005, and certainly by January 2006, the 22,500 sq. ft. facility was no

longer feasible and the parties agreed to decrease the size of the building." (Pl. Mem. at 6).

On February 22, 2006, LRNA sent a final letter offering a one-year deadline extension as to all phases of the project. (Def. Ex. 16). The letter indicated that Wagner had to contact Slocum by February 28 or the TDA would be terminated effective May 1, 2006. (*Id.* at ¶ 3). Ron Wagner was still in contact with Slocum in March 2006 in an attempt to "save the deal," but the parties did not come to an agreement. (R. Wagner Dep. at 268-69). Wagner contends, however, that the parties agreed that Wagner would build a smaller facility, and the final unsuccessful March negotiations were about the specific size of that facility.

On March 21, 2006, LRNA sent a "Notice of Termination of Land Rover Boylston." (Def. Ex. 17). The letter informed Wagner that the TDA (and thus, Wagner's ability to sell Land Rovers and related products) would expire in ninety days, or on June 24, 2006. The letter also stated the following:

> The grounds for termination include the failure of Land Rover Boylston to perform its obligations under the Dealer Agreement executed on August 31, 2004, and Land Rover Shrewsbury Letter of Intent issued October 21, 2002 and later amended June 14, 2004 . . . . The permanent facility was to be complete and operational by February 28, 2006. Despite our efforts to provide you timely notice of noncompliance with your obligations and our offers to amend the agreement with respect to the timing of completion, Land Rover Boylston has simply failed to perform.

(*Id.* at ¶ 3).

Pursuant to joint stipulation before this court on June 21, 2006, the parties agreed that Wagner would continue to do business as a temporary Land Rover dealer. This stipulation is still in effect, and will continue to remain in force until the litigation is resolved.[3]

---

[3] Both parties, however, expressly retained the ability to withdraw consent to the arrangement on 30 days' written notice to opposing counsel.

## II.   <u>Analysis</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

### A.   <u>Claims under Mass. Gen. Laws ch. 93B, § 3</u>

Plaintiff first contends that LRNA violated Mass. Gen. Laws ch. 93B, § 3 when it attempted to terminate the temporary franchise relationship. Section 3(a) of Chapter 93B declares "[u]nfair methods of competition and unfair or deceptive acts or practices" to be unlawful. Section 5(a) of the statute provides in part:

> It shall be a violation of subsection (a) of section 3 for a manufacturer, distributor or franchisor representative *without good cause*, in bad faith or in an arbitrary or unconscionable manner: (1) to terminate the franchise agreement of a motor vehicle dealer; (2) to fail or refuse to extend or renew the franchise agreement of a motor vehicle dealer upon its expiration . . .

(emphasis added). Section 5(h) provides in part:

> For purposes of this section, good cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship, including without limitation . . . facility requirements, which were communicated to the motor vehicle dealer within a reasonable period before the effective date of the termination or nonrenewal, such that a reasonable opportunity to cure was afforded.

(emphasis added). Section 5(j) provides:

9

In determining whether good cause has been established for terminating, refusing to extend or renew or changing or modifying the obligations of the motor vehicle dealer as a condition to offering a renewal, replacement or succeeding franchise agreement, the court shall consider all pertinent circumstances, that may include, but shall not be limited to:  [seven identified factors].

One of the seven factors listed is "the existence and materiality of any breaches, defaults or violations by the affected motor vehicle dealer of the terms or provisions of the existing franchise agreement or of applicable law."  Ch. 93B, § 5(j)(7).[4]  The burden is on the manufacturer or distributor to prove good cause to terminate the franchise.  Mass. Gen. Laws ch. 93B, § 5(m).

Plaintiff appears to contend that (1) there was no "material breach" of the 2004 letter of intent and the August 2004 TDA, because the parties subsequently amended those agreements to reflect the building of a smaller facility; (2) even if it did commit a material breach of those agreements, there was still not good cause for termination because the various factors set forth in

---

[4] The full list of factors set forth in § 5(j) is as follows:

(1) the amount of business transacted by the affected motor vehicle dealer during the 3 year period immediately preceding such notice as compared to the business available to it;

(2) the investment necessarily made and obligations incurred by the affected motor vehicle dealer to perform its obligations under the existing franchise agreement;

(3) the permanency of the investment of the affected motor vehicle dealer;

(4) whether it is injurious or beneficial to the public welfare for the franchise agreement of the affected motor vehicle dealer to expire, to be modified, or to be terminated, or for the affected motor vehicle dealer to be replaced;

(5) whether the affected motor vehicle dealer has adequate motor vehicle sales and service facilities, equipment, and qualified personnel to reasonably provide for the needs of the consumers for motor vehicles handled by the affected motor vehicle dealer;

(6) whether the affected motor vehicle dealer has been and is rendering adequate services to the public; and

(7) the existence and materiality of any breaches, defaults or violations by the affected motor vehicle dealer of the terms or provisions of the existing franchise agreement or of applicable law.

§ 5(j), taken in their entirety, favor plaintiff; (3) LRNA did not provide a reasonable opportunity to cure any alleged breach, as required by § 5(h); and (4) economic and logistical circumstances rendered the requirements of the 2004 letter of intent impracticable.  Each of these arguments will be considered in turn.

### 1.    Amendment of the 2004 Letter of Intent and the TDA

Plaintiff contends that the parties amended the 2004 letter of intent and the August 2004 TDA.  According to plaintiff, this amendment established that a "22,500 sq. ft. facility was no longer feasible and the parties agreed to decrease the size of the building," although it admits that the purported amendment did not specify the exact size of the new facility.  Plaintiff contends that this amendment was in effect, at the very latest, as of March 2006.

Plaintiff cites two sources of evidence in support of its position:  (1) various written communications between the parties in the late summer and fall of 2005 and (2) Ron Wagner's discussions with Virginia Slocum in early 2006.

At the outset, the Court notes that the 2004 letter of intent expressly states that "the terms, provisions, and conditions of this Agreement may not be changed, modified, or amended in any manner except by an instrument in writing duly executed by an officer of the party to be charged."  Plaintiff has not even attempted to assert that any of the communications that it cites meets that standard.

In any event, even assuming that the parties retained the ability to amend the agreement by a subsequent course of conduct, without more, the facts of this case would not permit such a finding.  Defendant's offers to extend the deadlines (and, as of September 19, 2005, to discuss reducing the size of the facility) were all expressly conditioned on plaintiff's agreement to an

11

amended contract.  *See, e.g.,* Def. Ex. 12 (August 2005 letter offering to extend construction deadlines stated that defendant was "willing to agree" to a twelve month extension of the construction deadlines "*subject to [plaintiff] signing amended agreements*") (emphasis added). Plaintiff, however, did not accept any of those offers.[5]

Plaintiff's contention that Virginia Slocum admitted that the 2004 letter of intent was later amended is also unsupported by the evidence.  First, Slocum testified that she had no contact with plaintiff before January 2006.  (Slocum Dep. at 41).  This was, of course, well after defendant had notified plaintiff that "time was of the essence" in the agreement and that plaintiff had failed to meet various deadlines (May 2005), and long after defendant offered to negotiate an amendment to the 2004 letter of intent (August and September 2005).  Second, Slocum repeatedly testified that she explained to plaintiff that the TDA was about to expire.  (*Id.* at 39-40).  She clearly stated that plaintiff did *not* agree to the proposed amendment offered by LRNA.  (*Id.* at 55).[6]

---

[5]  Plaintiff makes much of the fact that an October 18, 2005 e-mail to plaintiff from George Delaney states: "Attached is the reduced facility capacity summary you requested.  *It can serve as a starting point for reducing the facility size*." (Def. Ex. 15) (emphasis added).  The e-mail, however, goes on to state in the very next paragraph: "If you choose to go forward with the project, *then I want to prepare amendments to the Performance Agreement* for your father's signature . . . .  If you do not intend to move forward with the project then we need to know that also."  (*Id.*) (emphasis added).  Even this informal e-mail shows defendant's desire to formalize any amendment in writing, as the 2004 letter of intent expressly requires.

[6]  The Court also notes that plaintiff's "amendment" theory was not articulated until it appeared in its summary judgment pleadings.  In June 2006, Ron Wagner submitted a sworn affidavit before this court in support of defendant's June 2006 motion for a preliminary injunction.  In that affidavit, Wagner listed every agreement between plaintiff and defendant from September 1999 (when the parties agreed to a later-annulled letter of intent) through August 2004 (when the final TDA was signed).  Wagner never mentioned any post-August 2004 amendments in this affidavit, and in fact stated "Land Rover, however, *never adjusted its expectations regarding the facility build-out*." (emphasis added).

In addition, plaintiff's amended complaint listed all September 1999-August 2004 negotiations and agreements in its "General Allegations Common to All Counts" section, but again failed to mention the existence of any post-August 2004 amendment.  Indeed, both the Wagner affidavit and defendant's complaint attack defendant's termination of plaintiff's franchise exclusively on the grounds of "unconscionability."

In summary, even if the "instrument in writing" amendment provision of the 2004 letter of intent did not exist, there is no evidence sufficient to create a genuine issue of material fact as to whether the parties amended the agreement.

## 2.    Factors in Determining "Good Cause"

Plaintiff's failure to meet the interim construction deadlines and the final facility completion deadlines thus constituted a breach of the 2004 letter of intent.  Moreover, that breach was material.  In the TDA, defendant expressly "acknowledge[d] that even upon its fulfillment of these requirements [concerning the temporary operation], the Temporary Facility will not meet Land Rover's minimum facility standards and is not a suitable long-term facility for the sale and service of Land Rover vehicles."  Both the 2004 letter of intent and the TDA make defendant's completion of the new facility a condition precedent to the grant of a non-temporary Land Rover Dealer Agreement.  *See Autohaus, Inc. v. BMW of North America, Inc.,* 1993 WL 1503945, *1, *5 (D. Mass. 1993) (". . . a motor vehicle dealer's failure to comply with relocation requirements in a dealer agreement constitutes a material breach of the agreement, justifying termination").

Under Mass. Gen. Laws ch. 93B, § 5(h), "good cause" to terminate a franchise agreement may be found if the dealer failed to comply with a provision of the franchise agreement that is material to the relationship, including (but not limited to) facility requirements.  *Id.*  Plaintiff's failure to meet its various construction and facility completion deadlines clearly constituted "good cause" to terminate under § 5(h).  *See, e.g., Foreign Motors, Inc., v. Audi of America, Inc.,* 755 F. Supp. 30, 34-35 (D. Mass. 1991) ("Though Chapter 93B unquestionably sought to protect automobile dealers from the inequitable consequences of overweening economic power wielded by manufacturers, it does not purport to shield them entirely from adverse decisions formulated

on legitimate business and economic grounds") (internal citations omitted).

Section 5(j) states that the Court should consider "all pertinent circumstances," including the seven enumerated (but non-exhaustive) factors, in determining whether good cause to terminate has been established.  One of those factors, as noted, is "the existence and materiality of any breaches, defaults or violations by the . . . dealer . . . of the terms or provisions of the existing franchise agreement . . . ."  Plaintiff contends in substance that under the statute the Court must give weight to all of the elements set forth in Section 5(j), and may not focus solely on the factor set forth in Section 5(j)(7).

Plaintiff's argument distorts the plain text of Chapter 93B.  Under Section 5(h), the Court may make the "good cause" determination based solely on a material breach concerning facility requirements.  *See Autohaus,* 1993 WL 1503945 at *8 (manufacturer acted with good cause when it terminated dealer for failing to build facility required in the franchise agreement). Furthermore, and in any event, while the Court assigns heavy weight to the fact that Wagner materially breached its agreement, it has also considered the other factors set forth in Section 5(j). Among other things, the Court notes that Wagner had only begun selling Land Rovers in 1999, that its sales numbers were never particularly high, and that Wagner never constructed a permanent facility in which to sell them.  None of those factors warrant a finding that "good cause" was lacking within the meaning of Chapter 93B.  In short, there can be little doubt that the termination was for good cause.

The only authority cited by plaintiff, *Gallo Motor Center, Inc.*, *v. Mazda Motor of America, Inc.*, 347 F.3d 20, 25 (1st Cir. 2003) is inapposite.  *Gallo* dealt with a plaintiff's attempt to exclude evidence from trial in a dealer franchise dispute under Mass. Gen. Laws ch. 93B, § 4.

14

The issue was whether the granting of an additional franchise was "arbitrary" and made without notice to an existing franchisee, based on eight enumerated statutory factors. *Gallo*, 347 F.3d at 23. The *Gallo* court, based on the plain language of the statute, ruled that the list of factors was "nonexhaustive" and that courts could consider "all pertinent circumstances" in determining arbitrariness. *Id.* at 24-25. Here, in contrast, there is no claim that the Court is improperly considering information outside the enumerated statutory factors.

This Court accordingly finds that under both § 5(h) and § 5(j), defendant's termination of plaintiff's franchise was for good cause.

### 3.     Opportunity to Cure

On March 21, 2006, defendant sent plaintiff a final franchise termination notice. That notice informed plaintiff that it had "failed to meet the timelines agreed too in the terms and conditions set forth in this agreement," and terminated its Land Rover franchise effective June 24, 2006, ninety days later.

Plaintiff contends the notice was "invalid and fatally defective" under Section 5(h). That statute provides that a manufacturer is required to communicate in writing to the dealer within a reasonable period before the effective date of the termination (or non-renewal) such that "a reasonable opportunity to cure [is] afforded." Mass. Gen. Laws ch. 93B, § 5(h). Plaintiff contends that it had no reasonable opportunity to cure, because "Land Rover knew that the 22,500 sq. ft. facility could not be built within ninety days."

If the March 21, 2006 notice were the *only* contact between defendant to plaintiff since the TDA, arguably there would be a violation of Section 5(h). But plaintiff mistakenly characterizes the final termination notice as the only written communication between the parties

that provided an opportunity to cure.[7]  On May 16, 2005—more than ten months before the final

facility completion deadline—defendant notified plaintiff that it was in breach of interim

construction and planning deadlines, and explicitly stated that "the 'time of the essence paragraph'

in your Letter of Intent is material and will be enforced," and advised plaintiff that defendant

expected it to open the new facility "on [a] timely basis."  Between May 2005 and March 2006, it

is undisputed that defendant repeatedly offered plaintiff the opportunity to extend the deadline to

meet the terms of the 2004 letter of intent.  Reasonable opportunity to cure was amply afforded,

and defendant accordingly did not violate ch. 93B, § 5(h).[8]

### 4.    **Impracticability**

Plaintiff never explicitly invokes the impracticability doctrine.  Nonetheless, plaintiff's

memorandum argues that a facility of 22,533 square feet with a 400-unit "planning volume" was

"economically unfeasible"; that defendant knew, as early as 2004, that the market supporting

plaintiff's new franchise center was in "a state of decline"; that a 400-unit planning volume was

"not realistic" and "was known to be unrealistic when the termination was sent."  Although these

contentions are not fully developed, the Court will consider plaintiff's memorandum as having

---

[7]  Section 5(b) provides that manufacturers must provide dealers with sixty days' written notice before the effective franchise termination date, and must state the specific grounds for the termination.  Defendant's March 21, 2006 notice was in writing, was sent ninety days in advance, and explained:  "The grounds for termination include failure of Land Rover Boylston to perform its obligations under the [Temporary] Dealer Agreement executed on August 31, 2004 and Land Rover Shrewsbury Letter of Intent issued October 21, 2002 and later amended June 14, 2004."

[8]  Plaintiff also attacked the reasons for termination stated in the March 21, 2006 notice, contending that the TDA "does not appear to permit termination for the failure to construct the facility."  This is patently false.  The August 2004 TDA not only provides explicitly that a breach of the 2004 letter of intent's deadline and facility obligations "shall be deemed grounds for termination of this [TDA]," but also states that plaintiff would not be offered a permanent dealer agreement nor be "authorized to act as a Land Rover dealer" if plaintiff did not complete the facility.

raised the issue of impracticability.

Performance under a contract is excused on the grounds of impracticability if the hardships or risks "are so unusual and have such severe consequences that they must have been beyond the assignment of risks inherent in the contract, that is, beyond the agreement made by the parties." *Mishara Constr. Co., Inc. v. Transit-Mixed Concrete Corp.,* 365 Mass. 122, 129 (1974). Factors to be considered included "the foreseeability of the supervening event, allocation of the risk of the occurrence of the event, and the degree of hardship to the promisor." *Chase Precast Corp. v. John J. Paonessa Co.,* 409 Mass. 371, 375 n.4 (1991).

Even assuming the truth of all of plaintiff's contentions about the decline of the Land Rover and Jaguar markets, economic downturns and market shifts are not the type of risks that are "so unusual and have such severe consequences that they must have been beyond the assignment of risks inherent in the contract . . . ." *Mishara,* 365 Mass. at 129. If the normal ebb and flow of consumer demand in a market-based economy were adequate grounds for excusing contractual performance, scarcely any contract could be enforced at all. *See, e.g., Gurwitz v. Mercantile/Image Press, Inc.,* 2006 WL 1646144, *2 (Mass. Super. 2006) ("To find [that economic downturns and other market shifts constitute unanticipated circumstances] would extend the defense of impossibility to include any business that faces financial difficulty based on decreased demand for its products or services, and would allow business that have failed to anticipate or to protect themselves from market changes to avoid their obligations at the expense of innocent parties").[9] The doctrine of impracticability is accordingly not applicable.

---

[9] This foreseeable risk of market decline was also explicitly allocated to the plaintiff. The 2004 letter of intent specifically states that plaintiff "has not relied on any statements by Land Rover or its representatives with respect to any potential for . . . profit or loss, now or in the future." (Def. Ex. 8, ¶ 10). Plaintiff also agreed that

5.      **Conclusion**

Counts I and II assert identical violations of Mass. Gen. Laws ch. 93B, § 3, differing only in the relief sought:  injunctive relief (Count I) and monetary damages (Count II).  The above analysis therefore applies equally to both counts.  Defendant's termination of plaintiff's Land Rover franchise was for good cause, and did not violate Mass. Gen. Laws ch. 93B, § 5.  Summary judgment will accordingly be granted as to Counts I and II.

B.      **Claims under 15 U.S.C. § 1222**

Plaintiff further contends that LRNA violated the Automobile Dealer's Day in Court Act, 15 U.S.C. § 1222, when it attempted to terminate the temporary franchise relationship.  That statute states in relevant part:

> An automobile dealer may bring suit against any automobile manufacturer engaged in commerce . . . and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling or not renewing the franchise with said dealer:  *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

*Id.* (emphasis in original).  Under the statute, the term "good faith" means

> the duty . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party:  *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e) (emphasis in original).  Plaintiff contends that the attempt to terminate was not in good faith because the parties had already agreed that the specific facility referenced in the

---

"[plaintiff has] independently reviewed any projected financial commitments and potential for profits or losses that may result from entering into this Agreement, and that [plaintiff] is in a superior position as compared to Land Rover to know and understand your potential for such profit and/or loss."  (*Id.*).

2004 letter of intent (the 22,532 square feet facility) was not to be built.

In interpreting the statute's good faith provision, the First Circuit "has read the requirements of the ADDCA very narrowly to require actual or threatened coercion or intimidation." *George Lussier Enterprises, Inc. v. Subaru of New England, Inc.,* 393 F.3d 36, 43 (1st Cir. 2004) (quoting *General GMC, Inc., v. Volvo White Truck Corp., et al.,* 918 F.2d 306, 308 (1st Cir. 1990)). Lack of good faith does not simply mean malicious conduct or even unfairness; "it must be found in the context of actual or threatened coercion or intimidation." *H.D. Corp. of Puerto Rico v. Ford Motor Co.,* 791 F.2d 987, 990 (1st Cir. 1986); *see also Wallace Motor Sales v. American Motors Sales Corp.,* 780 F.2d 1049, 1056 (1st Cir. 1985) ("lack of good faith does not simply mean unfairness").

Coercion itself "must be actual; the mere fact that a dealer may have *felt* it had been coerced or intimidated is not sufficient." *Id.* (emphasis added). Alleged coercion or intimidation "must include a wrongful demand that would result in penalties or sanctions if not complied with." *George Lussier,* 393 F.3d at 43 (quoting *Wallace Motor Sales*, 780 F.2d at 1056). Summary judgment is warranted if the dealer "has produced no evidence showing that it was subjected to coercion or intimidation" by the manufacturer. *General GMC,* 918 F.2d at 308.

Plaintiff argues that various economic and practical issues that became apparent after June 2004 rendered defendant's demand to adhere to the contract (or renegotiate it) not "fair and equitable."[10] That argument clearly fails. A demand that a dealer comply with the terms of a valid

---

[10] Specifically, plaintiff cites the following "totality of the circumstances" that rendered LRNA's conduct "inequitable":

Land Rover's demand in the termination letter that Wagner build a 22,500 sq. ft. facility when Jaguar sales were in decline, the Freelander had been pulled from the market by Land Rover, the

franchise agreement cannot qualify as wrongful for § 1222 purposes.  *Autohaus,* 1993 WL

1503945 at *9 (citing *Empire Volkswagen, Inc., v. World-Wide Volkswagen Corp.,* 814 F.2d 90,

96-97 (2d Cir. 1987)).  That is true even in the face of declining economic conditions and

subsequent changes in sales estimates.  To hold otherwise would render the "good faith" standard

for franchise termination under 15 U.S.C. § 1222 meaningless, and invite a battle over economic

or sales data entirely unconnected to the clear terms of either the statute or the contract.

Defendant's repeated demand that plaintiff comply with or renegotiate the 2004 letter of

intent and the TDA or suffer the termination of the Land Rover franchise was in good faith within

the meaning of the statute.  Plaintiff has presented no other evidence showing coercion or

intimidation.  Summary judgment will therefore be granted for defendant as to the claim under 15

U.S.C. § 1222.

Again, Counts III and IV assert identical violations of 15 U.S.C. § 1222, differing only in

the relief sought:  injunctive relief (Count III) and money damages (Count IV).  Summary

judgment as to both counts is therefore appropriate.

---

fact that Jaguar had voluntarily cutback [sic] on its manufacturing capcity thereby reducing the
vehicles available for sale, the disarray in Jaguar marketing, the overall decline of sales of
Jaguars, the fact that in January, 2006, Virginia Slocum was clearly aware that the planning
volume had substantially declined and were less than half the volume set forth in the June 14,
2004 agreement, the fact that by 2008 Wagner would not reach a planning volume of 400, the
fact that Craig Samara knew that a planning volume of 190 was not economically viable for a
dealer, the fact that Land Rover had permitted a combined Land/Rover Jaguar facility in Ventura,
CA to open at 9,200 sq. ft. with a planning volume of 300, that the demographics of Wagner's
AOR were not as affluent as those to the east and the clear knowledge by Land Rover that the
economies of the circumstances could not support a 22,500 sq. ft. facility . . . .

(Plaintiff's Mem. at 13).

**III.    <u>Conclusion</u>**

For the foregoing reasons, the motion for summary judgment of defendant Land Rover

North America, Inc., is GRANTED.

**So Ordered.**

                                           /s/ F. Dennis Saylor_____
                                          F. Dennis Saylor IV
                                          United States District Judge

Dated:  March 19, 2008